1  Mark E. Merin (State Bar No. 043849)
   Paul H. Masuhara (State Bar No. 289805)
2  LAW OFFICE OF MARK E. MERIN
   1010 F Street, Suite 300
3  Sacramento, California 95814
   Telephone:      (916) 443-6911
4  Facsimile:      (916) 447-8336
   E-Mail:         mark@markmerin.com
5                  paul@markmerin.com

6  Fred J. Hiestand (State Bar No. 044241)
   FRED J. HIESTAND, A PROFESSIONAL CORPORATION
7  3418 3rd Avenue, Suite 1
   Sacramento, California 95817
8  Telephone:      (916) 448-5100
   Facsimile:      (916) 442-8644
9  E-Mail:         fhiestand@aol.com

10 Attorneys for Plaintiffs

11              UNITED STATES DISTRICT COURT

12            EASTERN DISTRICT OF CALIFORNIA

13               SACRAMENTO DIVISION

14 RICHARD L. BAYSE; MICHAEL R. CONROY;          Case No.
   MATTHEW J. HEATH; DANIEL KAHAKU;
15 OSCAR MACHADO; BRANDON W.                      **CLASS ACTION COMPLAINT**
   RACKLIFFE; RAPHAEL SANCHEZ; DAVID D.           **FOR VIOLATION OF CIVIL AND**
16 RICHARDS; LARRY SMITH; ANDREI BELEI;          **CONSTITUTIONAL RIGHTS**
   MIGUEL E. VASQUEZ; GEOFFREY T.
17 BROWN; FRANK A. FELIX; ANDREW W.              **DEMAND FOR JURY TRIAL**
   GRAY; MIKEY D. JOHNSON; RANDALL W.
18 ROY; JAMES C. STRINGER; and DANIEL
   VALENCIA, on behalf of themselves and a class of
19 similarly situated individuals,
20
21              Plaintiffs,
22 vs.
23 CALIFORNIA DEPARTMENT OF
   CORRECTIONS AND REHABILITATION; J.
24 CLARK KELSO, Receiver; CALIFORNIA
   CORRECTIONAL HEALTH CARE SERVICES,
25 Receiver; SCOTT KERNAN; DIANA TOCHE;
   and DOE 1 to 100,
26
27              Defendants.
28

                              1

## INTRODUCTION

In 2005, CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES was created as a receivership for the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION to bring the level of medical care in the California prison system up to constitutional standards. In 2008, J. CLARK KELSO was appointed Receiver by the federal court. Despite the existence of the receivership, Defendants and each of them have created and maintained a policy, custom, or practice of systematically denying necessary medical care to inmates diagnosed with Hepatitis C viral infections for which total cure through a short medication regimen has become available, thereby discriminating against them and placing them at substantial and unnecessary risk for severe pain, illness, injury, and death. The individual Defendants have denied necessary medical care to inmates, including Plaintiffs, who have been diagnosed with chronic Hepatitis C viral infections, and have caused them unnecessary pain and suffering and irreversible liver damage.

Plaintiffs bring this action seeking prospective relief on behalf of themselves and a class of similarly situated individuals to remedy the ongoing deprivation of their rights guaranteed by the Eighth Amendment of the United States Constitution (as incorporated by the Fourteenth Amendment) and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*. In addition, Plaintiffs seek an award of damages for the harm caused to them by the violation of their constitutional and statutory rights to life-saving treatment.

## JURISDICTION & VENUE

1.      This Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1331 (in that they arise under the United States Constitution); 28 U.S.C. § 1343(a)(3) (in that the action is brought to address deprivations, under color of state authority, of rights, privileges, and immunities secured by the United States Constitution). This Court has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

2.      Venue is proper in the United State District Court for the Eastern District of California pursuant to 28 U.S.C. § 1391(b) & (g) because the Defendants are located in the Eastern District of California and because many of the acts and/or omissions described herein occurred in the Eastern District of California.

3.     Intradistrict venue is proper in the Sacramento Division of the Eastern District of California pursuant to E.D. Cal. L.R. 120(d) because the claims asserted herein arise from acts and/or omissions which were promulgated or authorized by the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION located in the County of Sacramento, within the Eastern District of California's Sacramento Division; and which occurred in the Counties of Amador (Mule Creek State Prison), Lassen (California Correctional Center & High Desert State Prison), Sacramento (Folsom State Prison & California State Prison, Sacramento), San Joaquin (California Health Care Facility & Deuel Vocational Institution), Solano (California Medical Facility & California State Prison, Solano), within the Eastern District of California's Sacramento Division, as well as in all counties in the State of California in which the CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION maintain prisons in which it confines prisoners with diagnosed cases of viral Hepatitis C.

## PARTIES

4.     Plaintiffs RICHARD L. BAYSE, MICHAEL R. CONROY, MATTHEW J. HEATH, DANIEL KAHAKU, OSCAR MACHADO, BRANDON W. RACKLIFFE, RAPHAEL SANCHEZ, DAVID D. RICHARDS, LARRY SMITH, ANDREI BELEI, MIGUEL E. VASQUEZ, GEOFFREY T. BROWN, FRANK A. FELIX, ANDREW W. GRAY, MIKEY D. JOHNSON, RANDALL W. ROY, JAMES C. STRINGER, and DANIEL VALENCIA (collectively, "Plaintiffs") are all adult individuals currently incarcerated at various state prisons throughout the State of California, who are and have been denied curative treatment for Hepatitis C virus infection from which they all suffer.

5.     Defendant CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ("CDCR") is a "public entity" within the definition of Cal. Gov. Code § 811.2. Defendant CDCR is responsible for providing treatment for the serious medical needs of individuals in its custody.

6.     Defendant J. CLARK KELSO ("KELSO") and is, at all material times herein was, the court-appointed receiver for the California prison system, acting within the scope of that agency or employment and under color of state law. Defendant KELSO is responsible for maintaining and providing constitutionally and reasonably adequate medical care to inmates in the custody of Defendant

3

CDCR, including adopting, approving, and implementing the policies applicable to the prisons operated throughout the State of California. Upon information and belief, Defendant KELSO is a policymakers for Defendant CDCR. Defendant KELSO is sued in his official capacity.

7.     Defendant CALIFORNIA CORRECTIONAL HEALTH CARE SERVICES ("CCHCS") is the current health care provider for all of Defendant CDCR's facilities. At all material times herein, Defendant CCHCS acted and will act under the color of state law.

8.     Defendant SCOTT KERNAN ("KERNAN") is, at all material times herein was, Secretary for Defendant CDCR, acting within the scope of that agency or employment and under color of state law. Defendant KERNAN is responsible for the operations of Defendant CDCR, including adopting, approving, and implementing the policies applicable to the prisons operated throughout the State of California. Upon information and belief, Defendant KERNAN is the final policymaker for Defendant CDCR. Defendant KERNAN is sued in his official capacity.

9.     Defendant DIANA TOCHE ("TOCHE") is, at all material times herein was, Undersecretary, Health Care Services, for Defendant CDCR, acting within the scope of that agency or employment and under color of state law. Defendant TOCHE is responsible for the operations of Defendant CDCR's health care services for inmates, including adopting, approving, and implementing the policies applicable to the prisons operated throughout the State of California. Upon information and belief, Defendant TOCHE is a policymaker for Defendant CDCR. Defendant TOCHE is sued in her individual and official capacities.

10.     Defendants DOE 1 to 100 are and/or were agents, employees, agencies, and/or entities of Defendants CDCR, KELSO, CCHCS, KERNAN, and/or TOCHE, and acted within the scope of that agency or employment and under color of state law. The true and correct names of Defendants DOE 1 to 100 are not now known and they are sued by their fictitious names. The true and correct names of Defendants DOE 1 to 100 will be substituted when ascertained.

## GENERAL ALLEGATIONS

11.     At all times relevant herein, all wrongful acts described were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

12.     Plaintiffs are incarcerated in facilities operated by Defendant CDCR with serious health

4

conditions stemming from their chronic Hepatitis C viral infections. Defendants have refused to provide medical treatment to Plaintiffs and others with Hepatitis C viral infections that are consistent with current and prevailing medical standards. As a result, Defendants have harmed, and continue to harm, Plaintiffs and a class of similarly situated individuals.

13.     By not providing necessary medical care, Defendants cause immediate and substantial risks to Plaintiffs and those similarly situated with death and other irreparable harm stemming from their chronic Hepatitis C infections. Plaintiffs and members of the proposed class have suffered and will continue to suffer grave and irreparable harm unless the Court orders Defendants to provide the safe and effective treatment with direct-acting antiviral drugs as described herein.

**Chronic Hepatitis C Virus**

14.     Hepatitis C viral infection ("HCV") is a viral infection that attacks the liver and causes hepatitis, or liver inflammation. It is spread primarily through contact with infected blood.

15.     Liver inflammation caused by HCV can significantly impair liver function and damage its crucial role in digesting nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body.

16.     Liver impairment can cause severe pain, abdominal and gastrointestinal problems, fatigue, weakness, and muscle wasting, difficulty or pain with urination, increased risk of heart attacks, and other side effects.

17.     HCV can be either acute or chronic. A small percentage of people who are exposed to infected blood develop an acute infection that their body resolves without treatment. But a significant majority (75% to 85%) of people who develop acute HCV go on to develop chronic HCV.

18.     People with chronic HCV develop fibrosis of the liver, which is a process by which healthy liver tissue is replaced with scarring. Scar tissue cannot perform any of the jobs of normal liver cells, so fibrosis reduces liver function.

19.     When scar tissue begins to take over most of the liver, this extensive fibrosis is termed cirrhosis.

20.     Cirrhosis is irreversible. It can, and often does, cause additional painful complications, including widespread itching, arthritic pain throughout the body, kidney disease, jaundice, fluid retention

5

with edema, internal bleeding, easy bruising, abdominal ascites, mental confusion, lymph disorders, and even more extreme fatigue.

21.     In part because it can be difficult to determine exactly when significant hepatitis fibrosis becomes cirrhosis, most of these complications can occur before cirrhosis. If these complications go untreated, some can cause death.

22.     Health care providers who provide care to people with chronic HCV need to be aware of how drugs they prescribe can cause or exacerbate stress to the liver and need to counsel their HCV-positive patients appropriately about prescription and over-the-counter medications that affect the liver, including ibuprofen, naproxen, large doses of acetaminophen, and others.

23.     In addition to causing day-to-day pain and other problems, chronic HCV also dramatically increases a person's risk of developing cirrhosis and liver cancer.

24.     Of those with chronic HCV, at least half will develop cirrhosis or liver cancer, and almost everyone (70% to 95%) will develop chronic liver disease.

25.     Some 19,000 people die of HCV-caused liver disease every year in the United States. HCV is the leading indication for liver transplants in the United States.

26.     Hepatitis C virus is rampant in correctional facilities, including within the facilities of the CDCR.

27.     At least 15% of the population under the supervision, care, and custody of CDCR is infected with HCV.

28.     Since more than 90% of persons who are incarcerated are eventually released into the community, most of this population will return to the general population.

29.     Each day without treatment increases a person's likelihood of developing chronic liver disease, fibrosis, cirrhosis, liver cancer, painful complications, death from liver failure, and the risk of transmitting HCV to others.

30.     For persons with cirrhosis, each day without treatment causes additional irreversible scarring and permanently reduces the function of the liver.

**Standard of Care for Hepatitis C Virus**

31.     HCV treatment is successful when it results in a sustained virologic response ("SVR") for

6

three months following the end of treatment. SVR occurs when a person's blood has no detectable genetic material of the Hepatitis C virus. The medical community recognizes SVR as tantamount to a cure.

32.     For many years, finding and establishing an effective and safe treatment for Hepatitis C infections was a highly elusive goal. The standard treatment, which included the use of interferon and ribavirin medications, failed to cure most patients and was associated with painful and other adverse side effects, including psychiatric and autoimmune disorders, flu-like symptoms, and gastrointestinal distress.

33.     In the past four years, the Federal Drug Administration has approved new medications, called direct-acting antiviral ("DAA") drugs, which have proven to work more quickly, cause fewer side effects, and treat chronic HCV much more effectively.

34.     In 2011, the FDA approved the use of protease inhibitors called boceprevir (under brand name Victrelis) and telaprevir (under brand name Incivek), and the standard of care developed into a "triple therapy" to include the combination of either boceprevir or telaprevir, plus ribavirin and interferon. The triple therapy improved results for many patients, but continued to produce painful and adverse side effects, and the treatment could take 48 weeks to complete. Manufacturing of these drugs for the United States was discontinued between 2014 and 2015 because later treatments are superior.

35.     In 2013, the FDA approved DAA medications called simeprevir (under brand name Olysio) and sofosbuvir (under brand name Sovaldi). At this time, the recommended treatment was a DAA drug such as Sovaldi combined with either ribavirin or interferon, depending on the patient's other symptoms and medical diagnoses.

36.     In late 2014, the FDA approved the use of Sovaldi in combination with Olysio for the treatment of Hepatitis C.

37.     On October 10, 2014, the FDA approved a DAA drug called Harvoni, which is a pill that is taken once a day and combines sofosbuvir and ledipasvir.

38.     On December 19, 2014, the FDA approved a DAA drug under the brand name Viekira Pak, which combines a multi-ingredient tablet with ombitasvir, paritaprevir, and ritonavir and a tablet with dasabuvir.

39.     In July 2015 and later expanded in February 2016, the FDA approved daclatasvir (under

7

brand name Daklinza) for use with or without ribavirin for patients with one of two variations of chronic HCV, including the most common genotype in the United States.

40.    Also in July 2015, the FDA approved a pill that combines ombitasvir, paritaprevir, and ritonavir (under brand name Technivie), for use with ribavirin, for treatment of one variation of chronic HCV for patients without cirrhosis.

41.    In January 2016, the FDA approved a pill that combines elbasvir and grazoprevir (under brand name Zepatier) for the treatment of two variations of chronic HCV, including the most common genotype in the United States.

42.    On June 28, 2016, the FDA approved Epclusa, another new DAA drug that combines sofosbuvir and velpatasvir. It is the first drug approved to treat all six major variations, or genotypes, of HCV.

43.    Sovaldi (sofosbuvir), Olysio (simeprevir), Harvoni (sofosbuvir/ledipasvir), Viekira Pak (ombitasvir/paritaprevir/ritonavir/dasabuvir), Daklinza (daclatasvir), Technivie (ombitasvir/paritaprevir/ritonavir), Zepatier (elbasvir/grazoprevir), and Epclusa (sofosbuvir/velpatasvir) have few side effects, dramatically greater efficacy, can reduce treatment duration by up to 75 percent (from 48 weeks to 12 weeks in many cases), and are administered orally rather than by injections.

44.    These eight drugs are manufactured by five different drug companies:

    a.    Sovaldi, manufactured by Gilead Sciences

    b.    Olysio, manufactured by Janssen Research & Development

    c.    Harvoni, manufactured by Gilead Sciences

    d.    Viekira Pak, manufactured by AbbVie

    e.    Daklinza, manufactured by Bristol-Myers Squibb

    f.    Technivie, manufactured by AbbVie

    g.    Zepatier, manufactured by Merck & Co., Inc.

    h.    Epclusa, manufactured by Gilead Sciences

45.    Over 90 percent of patients treated with any of these DAA drugs are cured.

46.    Because of the obvious advantages of the DAA drugs, the medical standard of care for HCV is now well-established. The CDC encourages health care professionals to follow the evidence-

based standard of care developed by the Infectious Diseases Society of America (IDSA) and the American Association for the Study of Liver Diseases (AASLD).

47. The IDSA/AASLD guidelines are the medical standard of care.

48. Under the IDSA/AASLD guidelines, some groups of people should be routinely tested for HCV, including all persons born between 1945 and 1965 and all persons who were ever incarcerated.

49. As of January 2015, CDCR did not have a policy of routine opt-out testing for inmates under its supervision and care.

50. When the CDC/IDSA/AASLD standard of care was updated immediately after the first DAA drug was approved, these organizations provided "prioritization tables" and guidance on selecting patients with the greatest need because the "infrastructure . . . did not yet exist to treat all patients immediately."

51. But on July 6, 2016, these organizations updated the standard of care in recognition of the fact that continuing medical research has demonstrated the safety, tolerability, and dramatic benefits of treating all persons with chronic HCV.

52. The benefits demonstrated through vigorous research include: immediate decrease in liver inflammation, reduction in the rate of progression of liver fibrosis, improvement in necrosis and cirrhosis, reduction in portal hypertension and spleen enlargement, reduction in severe side effects including cryoglobulinemic vasculitis, a 70% reduction in the rate of liver cancer, a 90% reduction in the risk of liver-related mortality, and a dramatic increase in quality of life.

53. Other studies show treatment delay decreases the benefits associated with cure.

54. Under the current prevailing standard of care, treatment with DAA drugs "is expected to benefit nearly all chronically infected persons" and the CDC, AASLD, and ISDA recommend treatment for all patients with chronic HCV infection.

**Methods for Determining Progression of Fibrosis/Cirrhosis**

55. A person is generally diagnosed with HCV through a rapid blood test in which the blood is examined for HCV antibodies. A follow-up blood test determines whether the genetic material (RNA) of the Hepatitis C virus remains in the blood. Finally, a third blood test can determine which variation, or genotype, of HCV a person has.

9

56.     These diagnostic tests are different from the test(s) used to determine the progression of a person's fibrosis or cirrhosis.

57.     The severity of a person's fibrosis or cirrhosis should never be used to determine whether a person should be treated.

58.     Although the standard of care is to treat all persons with chronic HCV with DAA drugs, it is still useful to determine the progression (staging) of fibrosis and/or cirrhosis in the liver to choose among the DAA drugs for the most appropriate treatment module for HCV, to treat other conditions or complications a person may be experiencing, and to advise patients about contraindications and drugs to avoid.

59.     Health care providers use several methods to determine the advancement of a HCV-positive person's cirrhosis or fibrosis. These methods include, but are not limited to:

a.      Liver biopsy; a surgery where a provider removes a small sample of liver tissue and undertakes a histological assessment

b.      APRI (AST to Platelet Ratio Index); using a blood sample, a ratio derived using the level of a certain enzyme in the blood, aspartate aminotransferase ("AST"), and comparing it to (1) usual amount of AST in the blood of a healthy person and (2) the number of platelets in the affected person's blood

c.      FIB-4; using a blood sample, a ratio derived using the level of two enzymes in the blood, AST and alanine aminotransferase ("ALT"), as well as platelet count and the person's age

d.      FibroScan; a type of ultrasound known as transient elastography, which images a several-centimeter mass of liver tissue

60.     When an APRI score is extremely high, it has good diagnostic utility in predicting severe fibrosis or cirrhosis, but low and mid-range scores miss many people who have significant fibrosis or cirrhosis.

61.     For instance, in more than 90% of cases, an APRI score of at least 2.0 indicates that a person has cirrhosis. But more than half of people with cirrhosis will not have an APRI score of at least 2.0.

62.     Where a person has been diagnosed with cirrhosis through some other means, an APRI score is irrelevant and using an APRI score to measure the progression of fibrosis is unnecessary.

63.     In addition, because the levels of AST and ALT fluctuate from day to day, a decreased or normalized level does not mean the condition has improved, and even a series of normal readings over time may fail to accurately show the level of fibrosis or cirrhosis.

64.     Furthermore, not only do the levels of elevation of AST and ALT often fail to show the current level of fibrosis or cirrhosis, they also often fail to predict the eventual outcomes of a failure to treat the disease in a specific person.

65.     Moreover, an APRI score relies only on AST and fails to take into account ALT, even though—because ALT is found predominately in the liver and not all over the body like AST—ALT is a more specific indicator of liver inflammation than AST.

66.     For all these reasons, using APRI score alone to determine the severity of a person's fibrosis or cirrhosis is not adequate or appropriate.

**Plaintiffs**

67.     Plaintiffs identified herein became infected and/or were diagnosed with HCV while under the care and supervision of Defendant CDCR.

68.     Plaintiffs identified herein all experienced adverse symptoms of HCV while in the care and custody of CDCR and requested medical treatment at the prisons wherein they were incarcerated.

69.     Defendants and their agents and employees who have seen and denied treatment to plaintiffs and to each of those similarly situated prisoners within the care and custody of Defendants, have acted with deliberate indifference and have refused to treat Plaintiffs and each of them with DAA drugs in contravention of the prevailing standard of care.

70.     Plaintiffs and each of them are experiencing serious symptoms consistent with HCV symptoms, as aforesaid. To date, Plaintiffs have not received the curative treatments readily available for treatment of their HCV.

71.     Plaintiffs have requested treatment multiple times and have submitted substantial evidence of their attempts to complete Defendant CDCR's grievance process, and have either not received timely responses or received responses that violated prison policy, so they have all exhausted administrative

11

remedies.

72.     Plaintiff RICHARD L. BAYSE, E28715 ("BAYSE") is a prisoner incarcerated at Mule Creek State Prison ("MCSP"). Plaintiff BAYSE was first confined at MCSP in 1997 before being transferred to High Desert State Prison ("HDSP"), Calipatria State Prison ("CAL"), Corcoran State Prison ("CSP-COR"), Richard J. Donovan State Prison ("RJD"), Folsom State Prison ("FSP") and finally returned to MCSP in 2014. Plaintiff BAYSE was first diagnosed with HCV in 1998. At each of the state prisons in which he was confined, Plaintiff BAYSE requested treatment for HCV but was consistently and repeatedly denied treatment, being told by Defendant CDCR and its agents and employees that he did not qualify for treatment because he was not sick enough. As a result of having untreated HCV, Plaintiff BAYSE has almost no energy, has jaundice, nausea and generalized pain.

73.     Plaintiff MICHAEL R. CONROY, H09374 ("CONROY") is incarcerated at MCSP where he was first diagnosed with HCV in 2007. Plaintiff CONROY requested treatment for HCV at MCSP, then at the institutions to which he was subsequently transferred, Kern Valley State Prison ("KVSP") and CSP-COR, but was denied treatment with the explanation that he was not at the proper stage, that if he was at the "end stage" he might be considered. Plaintiff CONROY suffers from chronic abdominal pain as a result of being infected with the HCV virus.

74.     Plaintiff MATTHEW J. HEATH, AC7885 ("HEATH") is incarcerated at MCSP. Plaintiff HEATH was first diagnosed with HCV in 2012 while incarcerated at CSP-COR. Plaintiff HEATH requested treatment for the HCV virus while incarcerated at California State Prison, Los Angeles County ("LAC"), MCSP and at CSP-COR, but was denied treatment at each institution with the explanation that he would have to reach a stage 3 or stage 4 before qualifying for treatment. As a result of his infection with the HCV virus, Plaintiff HEATH suffers extreme fatigue, lesions that itch and bleed, and pain and pressure in his right abdomen.

75.     Plaintiff DANIEL KAHAKU, J61059 ("KAHAKU") is incarcerated at MCSP. Plaintiff KAHAKU was diagnosed with HCV in 2001 while at California State Prison, Sacramento ("SAC"), where he requested but was denied treatment for the HCV virus. Subsequently, Plaintiff KAHAKU was transferred to Pelican Bay State Prison ("PBSP"), California Correctional Institution ("CCI") in Tehachapi, and North Kern State Prison ("NKSP"), at each of which institutions he requested but was

12

denied treatment for his HCV because "treatment was not necessary." As a result of the HCV infection, Plaintiff KAHAKU suffers from exhaustion, jaundice, headaches, dizziness and loss of appetite.

76.     Plaintiff OSCAR MACHADO, E92214 ("MACHADO") is incarcerated at MCSP. Plaintiff MACHADO was diagnosed with HCV while at SAC in 2000. Plaintiff MACHADO was subsequently transferred to LAC, RJD, Substance Abuse Treatment Facility and State Prison, Corcoran ("SATF-CSP"), and CSP-COR at each of which institutions he requested but was denied treatment for his HCV, being told he had to be at stage 4 before he would qualify for treatment. Plaintiff MACHADO suffers depression, loss of appetite, dizziness and loss of energy as a result of his HCV infection.

77.     Plaintiff BRANDON W. RACKLIFFE, V23754 ("RACKLIFFE") is incarcerated at MCSP. Plaintiff RACKLIFFE was diagnosed with HCV in 2009 and has been attempting since then to receive treatment. Despite repeatedly having the highest viral load seen at MCSP, Plaintiff RACKLIFFE has been denied treatment for his HCV and has exhausted all appeals for the treatment. As a direct result of the HCV infection, Plaintiff RACKLIFFE suffers fatigue, leg swelling, and jaundice.

78.     Plaintiff RAPHAEL SANCHEZ, V73311 ("SANCHEZ") is incarcerated at MCSP. Plaintiff SANCHEZ was diagnosed with HCV in 2009 while in custody at Pleasant Valley State Prison ("PVSP"). Learning in 2015 of the effectiveness of Harvoni for treatment of his disease, Plaintiff SANCHEZ requested treatment but was told he was denied because Harvoni was cost-prohibitive and, in any event, would only be given if he reached stage 3 or 4 liver disease. Plaintiff SANCHEZ suffers stomach pains, experiences jaundice and is lethargic as a result of his HCV condition.

79.     Plaintiff DAVID D. RICHARDS, E40024 ("RICHARDS") is a prisoner at California Health Care Facility, Stockton ("CHCF"). Plaintiff RICHARDS was diagnosed with HCV in 2005 while incarcerated at RJD. Plaintiff RICHARDS was denied treatment because he had not gotten to stage 4 liver disease and cirrhosis but most recently he is being denied treatment because his disease is too advanced. Plaintiff RICHARDS is retaining fluid, suffers upper and lower extremity pain, encephalopathy and fatigue as a result of his HCV infection.

80.     Plaintiff LARRY SMITH, K91850 ("SMITH") is a prisoner incarcerated at CHCF. Plaintiff SMITH was first diagnosed with HCV while at RJD in 1996. Plaintiff SMITH has requested and been denied treatment for his HCV disease at CSP-COR, KVSP, PBSP, California Medical Facility

13

("CMF"), and SAC. Plaintiff SMITH has appealed the denial of treatment and exhausted his appeal opportunities. At PBSP, Plaintiff SMITH was informed that curative treatment was "too expensive" and that it was not fair for prisoners to get treatment while the same treatment was not provided to veterans. As a result of having untreated HCV, Plaintiff SMITH suffers chronic fatigue, pain, depression, his skin is very dry and irritated, and his fingernails ache constantly. Plaintiff SMITH has attempted suicide on several occasions.

81.    Plaintiff ANDREI BELEI, K44461 ("BELEI") is a prisoner at PVSP. Plaintiff BELEI was first diagnosed with HCV virus in 2012 while incarcerated at LAC. Plaintiff BELEI has continuously requested treatment but been denied for various reasons including the explanation that his disease is not yet bad enough to warrant treatment. Plaintiff BELEI has exhausted his appeals from the denial of treatment. As a result of having untreated HCV, Plaintiff BELEI suffers chronic fatigue.

82.    Plaintiff MIGUEL E. VASQUEZ, V77279 ("VASQUEZ") is a prisoner at Valley State Prison ("VSP"). Plaintiff VASQUEZ was diagnosed with HCV in 1998 while at MCSP. Plaintiff VASQUEZ has requested treatment for his HCV with Harvoni, or a curative treatment currently available, but was denied such treatment without explanation of a reason for the denial. As a result of having untreated HCV, Plaintiff VASQUEZ suffers severe pain, abdominal swelling, exhaustion, severe itching and vertigo.

83.    Plaintiff GEOFFREY T. BROWN, P73616 ("BROWN") is a prisoner at CSP-COR. Plaintiff BROWN was first diagnosed with the HCV virus in 2012 while at California Men's Colony ("CMC"). While initially told he would get treated with oral medication, Plaintiff BROWN was transferred to CSP-COR and has now been informed that he cannot get treatment because he does not have "end stage" disease. As a result of having HCV, Plaintiff BROWN suffers fatigue, nausea, headaches and right side abdominal pain. Plaintiff BROWN's skin and eyes are jaundiced and he is depressed and anxious.

84.    Plaintiff FRANK A. FELIX, H51129 ("FELIX") is a prisoner at CSP-COR. Plaintiff FELIX was diagnosed with HCV in 2001 while at CAL. Plaintiff FELIX was initially given some ineffective treatment but has been denied new, effective medication, such as Harvoni, at CSO-COR and has been told that he is being denied treatment because the effective medication is too expensive.

14

Plaintiff FELIX has appealed the denial of effective treatment. As a result of having the HCV virus, Plaintiff FELIX suffers extreme fatigue, pain in the liver area, joint pain and deterioration of his eye sight.

85.     Plaintiff ANDREW W. GRAY, V95089 ("GRAY") is a prisoner at CSP-COR. Plaintiff GRAY was first diagnosed with HCV virus in 2013 and requested treatment. Plaintiff GRAY's treatment was and has been continuously denied because effective treatment with Harvoni is supposedly "too expensive" and because he has not reached end stage liver disease. Plaintiff GRAY has appealed the denial of effective treatment. As a result of suffering from HCV, Plaintiff GRAY experiences chronic fatigue, liver pain, and irritable bowel.

86.     Plaintiff MIKEY D. JOHNSON, AT3515 ("JOHNSON") is a prisoner at CSP-COR. Plaintiff JOHNSON was diagnosed with the HCV virus in 2012 while incarcerated at Avenal State Prison ("ASP"). Plaintiff JOHNSON has requested and been denied effective, curative treatment for his disease continuously since being diagnosed. Plaintiff JOHNSON has filed an appeal of the denial and has been told the reason he is being denied treatment is that the disease "is not killing him" so he does not need treatment. As a result of having untreated HCV, Plaintiff JOHNSON's stomach aches and he feels weak.

87.     Plaintiff RANDALL W. ROY, P77717 ("ROY") is a prisoner at PVSP. Plaintiff ROY was first diagnosed with HCV in 2006 at RJD. Plaintiff ROY requested Harvoni treatment beginning in 2015 at CSP-COR but has been continually denied treatment. Plaintiff ROY appealed the denial, to no avail, and has been told his liver disease is not yet bad enough to warrant treatment. As a result of having HCV, Plaintiff ROY suffers constant pain, low energy, and sores on his body do not heal.

88.     Plaintiff JAMES C. STRINGER, P96088 ("STRINGER") is a prisoner at SATF-CSP. Plaintiff STRINGER was first diagnosed with HCV in 2000 and thereafter, every six months, requested treatment at the prisons in which he has been incarcerated. While denying him effective Harvoni treatment, Plaintiff STRINGER has been told first that Harvoni treatment had not been approved and, next, that he did not qualify for such treatment. Plaintiff STRINGER suffers from chronic fatigue and pain in the area of the liver.

89.     Plaintiff DANIEL VALENCIA, H73555 ("VALENCIA") was first diagnosed with HCV

15

in 1987 when he was at Pacoima California Hospital. Plaintiff VALENCIA has requested treatment at SATF-CSP and at CSP-COR but has been continuously denied treatment. Plaintiff VALENCIA was told he would be approved only if he was dying or had stage 4 liver disease. As a result of his HCV disease, Plaintiff VALENCIA is very weak, at times is unable to get out of his bed, and cannot walk to meals.

## Class Members

90.     Plaintiffs identified herein are representatives on behalf of a large class which, on information and belief, consists of hundreds, if not thousands, of prisoners suffering from HCV.

## POLICY, CUSTOM, OR PRACTICE ALLEGATIONS

91.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of not providing DAA drug treatment to all inmates with HCV, or even all inmates with chronic HCV, in contravention of the prevailing standard of care and in deliberate indifference to the serious medical need for treatment.

92.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of using an APRI score—which measures the progression of fibrosis or cirrhosis—to determine whether a person should be treated, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

93.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of not undertaking liver biopsies, FIB-4, FibroScan, or other methods of determining the stage of fibrosis or cirrhosis and relying exclusively on APRI score to determine that stage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

94.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of failing even to consider providing treatment to HCV-positive inmates unless they have an "APRI score" above 2.0 that persists for several months, even though more than half of persons with cirrhosis will not have an APRI score at or above 2.0 and they know that AST levels are transient, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

95.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of disregarding independent diagnoses of cirrhosis or significant hepatitic fibrosis in making treatment decisions, in contravention of the prevailing standard of care and in deliberate

16

indifference to serious medical need.

96.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of basing treatment decisions on cost, rather than on need for treatment, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

97.     These policies or customs have caused, and continue to cause, unnecessary and wanton infliction of pain and an unreasonable risk of serious damage to the health of HCV-positive inmates.

98.     Contrary to the proper and necessary medical procedures and the community standard of care, Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have repeatedly denied requests by Plaintiffs, and by other members of the class, for the appropriate and medically necessary direct-acting antiviral treatment for their Hepatitis C infections.

99.     Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have a policy or custom of failing to require appropriate counselling of HCV-positive patients, and continuity of care across the CDCR system, related to contraindications for other medications that exacerbate liver damage, in contravention of the prevailing standard of care and in deliberate indifference to serious medical need.

## CLASS ALLEGATIONS

100.     Plaintiffs bring their class action for prospective relief against Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 as a class action on behalf of themselves and all others similarly situated pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) & (3).

101.     Plaintiffs seek to represent the following class on claims for damages, declaratory and injunctive relief: all individuals in the custody of CDCR who have been or will be diagnosed with HCV but who are not provided treatment with DAA drugs.

102.     As a result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's deliberate indifference to the serious medical needs of the class, members of the class are or will be subjected to cruel and unusual punishment and deprived of their constitutional and statutory rights. Plaintiffs seek declaratory and injunctive relief to remedy Defendants' illegal and unconstitutional actions, policies and customs, and practices.

103.     The information as to the precise size of the class and the identity of the inmates who are

17

in the class is in the exclusive control of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100. The class encompasses thousands of individuals under the custody of CDCR, who are geographically dispersed throughout the State of California. The number of persons who are members of the class described above are so numerous that joinder of all members in one action is impracticable.

104.   Because the Class seeks prospective relief only, questions of law and fact that are common to the entire Class predominate over individual questions because the actions of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 complained of herein were generally applicable to the entire class. These legal and factual questions include, but are not limited to:

a.   Whether Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 maintain a policy or custom of withholding treatment with DAA drugs from individuals in the custody of CDCR who have been or will be diagnosed with HCV;

b.   Whether the policy and custom of CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 of withholding treatment with DAA drugs from individuals in the custody of CDCR who have been diagnosed with HCV constitutes deliberate indifference to a serious medical need; and

c.   Whether the policy and custom of CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 of withholding treatment with DAA drugs from individuals in the custody of CDCR who have been diagnosed with HCV discriminates based on their diagnosis in that CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 do not have a custom or policy of withholding life-saving treatment from inmates with illnesses other than HCV.

105.   Plaintiffs' claims for prospective relief are typical of the members of the class because Plaintiffs and all class members are subject to ongoing harm by the same wrongful policy and custom of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 of withholding treatment from them. Plaintiffs' claims arise from the same practices and course of conduct that give rise to the claims of the class members, and they are based on the same legal theories.

106.   Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests that are contrary to or in conflict with those of the Class they seek to represent. Plaintiffs are

represented by competent and skilled counsel whose interests are fully aligned with the interests of the Class.

107.    Relief concerning Plaintiffs' rights under the laws herein alleged and with respect to the Class would be proper. Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with regard to Class Members as a whole and certification of the Class under Rule 23(b)(2) proper.

108.    The Class is so numerous that joinder of all members is impractical.

109.    The claims of the representative Plaintiffs are typical of the claims of the class members. The representative parties will fairly and adequately represent the interests of the class.

110.    The class representatives know of no conflict of interest among class members. Plaintiffs are represented by Mark E. Merin, Paul H. Masuhara, and Fred J. Hiestand who are experienced civil rights attorneys who can vigorously prosecute this action.

## EQUITABLE ALLEGATIONS

111.    On information and belief, unless enjoined from violating federal and state constitutional provisions, Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's disregard of those constitutional provisions will continue and inmates will likely be damaged, as Plaintiffs have been and continue to be damaged.

## FIRST CLAIM

### Right to Medical Care

**(Eighth and Fourteenth Amendments to the U.S. Constitution; 42 U.S.C. § 1983)**

112.    The First Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU, MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX, GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of similarly situated individuals, against Defendants KELSO, KERNAN, TOCHE, and DOE 1 to 100.

113.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 111, to the extent relevant, as if fully set forth in this Claim.

114.    Defendants' acts and omissions in failing to provide adequate medical care, and delaying

19

care, constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate the Eighth Amendment to the United States Constitution. At all times relevant, Plaintiffs had a serious medical need for treatment of his HCV with DAA drugs, Defendants were aware of Plaintiffs' serious need for medical care and acted with deliberate indifference, failed to provide the medical care or failed to direct that the medical care be provided, and as a direct result Plaintiffs were harmed.

115.   Defendants acted pursuant to and in accordance with a policy, custom, or practice of Defendants KELSO, KERNAN, TOCHE, and DOE 1 to 100 to withhold treatment with DAA drugs from persons diagnosed with HCV.

116.   As a direct and proximate result of Defendants KELSO, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, pray for relief as hereunder appears.

## SECOND CLAIM

### Americans With Disabilities Act

### (42 U.S.C. § 12101, *et seq.*)

117.   The Second Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU, MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX, GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of similarly situated individuals, against Defendants CDCR, CCHCS, and DOE 1 to 100.

118.   Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 111, to the extent relevant, as if fully set forth in this Claim.

119.   Defendants CDCR, CCHCS, and DOE 1 to 100 are a "public entity" within the meaning of 42 U.S.C. § 12131(1)(A) and 28 C.F.R. § 35.104. Plaintiffs, and the class they seek to represent, have a disability within the meaning of 42 U.S.C. § 12102(1) and 28 C.F.R. § 35.104, and is "a qualified individual with a disability" within the meaning of 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104,

because each of them meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by Defendants CDCR, CCHCS, and DOE 1 to 100, other than the fact that each of them requires reasonable modifications to rules, policies, or practices, the removal of barriers, or the provision of auxiliary aids and services. Defendants CDCR, CCHCS, and DOE 1 to 100 subject Plaintiffs, and members of the class they seek to represent, to discrimination by withholding medically appropriate treatment that will likely cure their disability, although Defendants CDCR, CCHCS, and DOE 1 to 100 do not withhold life-saving treatments from individuals with different (other than HCV infection) disabilities.

120.    As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, pray for relief as hereunder appears.

## THIRD CLAIM

### Rehabilitation Act

### (29 U.S.C. § 794, *et seq.*)

121.    The Third Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU, MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX, GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of similarly situated individuals, against Defendants CDCR, CCHCS, and DOE 1 to 100.

122.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 111 and 119, to the extent relevant, as if fully set forth in this Claim.

123.    As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals,

21

1    pray for relief as hereunder appears.

2                                    **FOURTH CLAIM**

3                              **Declaratory Judgment Act**

4                                **(28 U.S.C. § 2201(a))**

5          124.    The Fourth Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU,

6    MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX,

7    GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of

8    similarly situated individuals, against Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and

9    DOE 1 to 100.

10         125.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 123, to

11   the extent relevant, as if fully set forth in this Claim.

12         126.    There presently exists an actual controversy between the parties regarding whether

13   Defendants' policies are lawful under federal law. Plaintiffs are informed and believe, and thereupon

14   allege, that Defendants continue to enforce their policies, as described, to the detriment of Plaintiffs and

15   the class of persons they seek to represent. This controversy requires a declaration from this Court as to

16   the rights of the respective parties, and the lawfulness of Defendants' policies.

17         127.    As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN,

18   TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and

19   injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the

20   failure to treat their HCV with effective DAA drugs.

21         WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals,

22   pray for relief as hereunder appears.

23                                     **FIFTH CLAIM**

24                               **Right to Medical Care**

25                               **(Cal. Const. Art. I, § 17)**

26         128.    The Fifth Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU,

27   MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX,

28   GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of

                                              22

similarly situated individuals, against Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100.

129. Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 111, to the extent relevant, as if fully set forth in this Claim.

130. Defendants' acts and omissions in failing to provide adequate medical care, and delaying care, constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, and they thereby violate article I, section 17 of the California Constitution. At all times relevant, Plaintiffs had a serious medical need for treatment of his HCV with DAA drugs, Defendants were aware of Plaintiffs' serious need for medical care and acted with deliberate indifference, failed to provide the medical care or failed to direct that the medical care be provided, and as a direct result Plaintiffs were harmed.

131. Defendants acted pursuant to and in accordance with a policy, custom, or practice of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 to withhold treatment with DAA drugs from persons diagnosed with HCV.

132. As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, pray for relief as hereunder appears.

## SIXTH CLAIM

### Bane Act

### (Cal. Civ. Code § 52.1; Cal. Gov. Code §§ 844.6(a) and 814)

133. The Sixth Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU, MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX, GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of similarly situated individuals, against Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100.

23

134.     Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 132, to the extent relevant, as if fully set forth in this Claim.

135.     Defendants' acts and omissions in failing to provide adequate medical care, and delaying care, constitute deliberate indifference to the serious medical needs of prisoners infected with HCV. At all times relevant, Plaintiffs had a serious medical need for treatment of his HCV with DAA drugs, Defendants were aware of Plaintiffs' serious need for medical care and acted with deliberate indifference, failed to provide the medical care or failed to direct that the medical care be provided, and as a direct result Plaintiffs were harmed. Defendants acted intentionally, with deliberate indifference, and interfered with Plaintiffs' civil rights in violation of their rights secured under the Eighth Amendment to the United States Constitution, the Americans with Disabilities Act, the Rehabilitation Act, and article I, section 17 of the California Constitution.

136.     Defendants acted pursuant to and in accordance with a policy, custom, or practice of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100 to withhold treatment with DAA drugs from persons diagnosed with HCV.

137.     As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, pray for relief as hereunder appears.

## SEVENTH CLAIM

### Declaratory Judgment

### (Cal. Code Civ. Proc. § 1060)

138.     The Seventh Claim is asserted by Plaintiffs BAYSE, CONROY, HEATH, KAHAKU, MACHADO, RACKLIFFE, SANCHEZ, RICHARDS, SMITH, BELEI, VASQUEZ, BROWN, FELIX, GRAY, JOHNSON, ROY, STRINGER, and VALENCIA, on behalf of themselves and a class of similarly situated individuals, against Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100.

139.    Plaintiffs reallege and incorporate the allegations of the preceding paragraphs 1 to 137, to the extent relevant, as if fully set forth in this Claim.

140.    There presently exists an actual controversy between the parties regarding whether Defendants' policies are lawful under state law. Plaintiffs are informed and believe, and thereupon allege, that Defendants continue to enforce their policies, as described, to the detriment of Plaintiffs and the class of persons they seek to represent. This controversy requires a declaration from this Court as to the rights of the respective parties, and the lawfulness of Defendants' policies.

141.    As a direct and proximate result of Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOE 1 to 100's actions and inactions, Plaintiffs suffered and, unless the declaratory and injunctive relief prayed for is provided, likely will suffer injuries and complications resulting from the failure to treat their HCV with effective DAA drugs.

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, pray for relief as hereunder appears.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and a class of similarly situated individuals, seek Judgment as follows:

1.    Issuance of a judgment declaring that Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOES 1 to 100's policy of withholding treatment with DAA drugs from inmates diagnosed with HCV violates the Eighth and Fourteenth Amendments of the United States Constitution, the Americans with Disabilities Act, the Rehabilitations Act, and article I, section 17 of the California Constitution;

2.    Entry of a preliminary and permanent injunction directing that: (a) Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOES 1 to 100 formulate and implement an HCV treatment policy that meets the prevailing standard of care, including identifying persons with HCV; (b) Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOES 1 to 100 treat members of the Class with appropriate DAA drugs; and (c) Defendants CDCR, KELSO, CCHCS, KERNAN, TOCHE, and DOES 1 to 100 provide members of the class an appropriate and accurate assessment of the level of fibrosis or cirrhosis they have, counseling on drug-drug interactions, and ongoing medical care for complications and

1  symptoms of HCV; and (d) any further appropriate injunctions to prevent the future deprivation of rights of

2  members of the plaintiff class;

3       3.     An award of Plaintiffs' costs, including reasonable attorneys' fees pursuant to 42 U.S.C. §

4  1988, Cal. Civ. Code § 52.1, Cal. Code Civ. Proc. § 1021.5, and other relevant provisions of law; and

5       4.     Allow such other and further relief to which Plaintiffs may be entitled.

6  Dated: February 6, 2018             Respectfully Submitted,

By: _____

Mark E. Merin
Paul H. Masuhara
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:     (916) 443-6911
Facsimile:     (916) 447-8336

Fred J. Hiestand
FRED J. HIESTAND, A PROFESSIONAL CORPORATION
3418 3rd Avenue, Suite 1
Sacramento, California 95817
Telephone:     (916) 448-5100
Facsimile:(916) 442-8644

Attorneys for Plaintiffs
RICHARD L. BAYSE, MICHAEL R. CONROY,
MATTHEW J. HEATH, DANIEL KAHAKU,
OSCAR MACHADO, BRANDON W.
RACKLIFFE, RAPHAEL SANCHEZ, DAVID D.
RICHARDS, LARRY SMITH, ANDREI BELEI,
MIGUEL E. VASQUEZ, GEOFFREY T. BROWN,
FRANK A. FELIX, ANDREW W. GRAY, MIKEY
D. JOHNSON, RANDALL W. ROY, JAMES C.
STRINGER, and DANIEL VALENCIA

26

## JURY TRIAL DEMAND

A JURY TRIAL IS DEMANDED on behalf of Plaintiffs RICHARD L. BAYSE, MICHAEL R. CONROY, MATTHEW J. HEATH, DANIEL KAHAKU, OSCAR MACHADO, BRANDON W. RACKLIFFE, RAPHAEL SANCHEZ, DAVID D. RICHARDS, LARRY SMITH, ANDREI BELEI, MIGUEL E. VASQUEZ, GEOFFREY T. BROWN, FRANK A. FELIX, ANDREW W. GRAY, MIKEY D. JOHNSON, RANDALL W. ROY, JAMES C. STRINGER, and DANIEL VALENCIA.

Dated: February 6, 2018

Respectfully Submitted,

By: _____

Mark E. Merin
Paul H. Masuhara
LAW OFFICE OF MARK E. MERIN
1010 F Street, Suite 300
Sacramento, California 95814
Telephone:      (916) 443-6911
Facsimile:      (916) 447-8336

Fred J. Hiestand
FRED J. HIESTAND, A PROFESSIONAL CORPORATION
3418 3rd Avenue, Suite 1
Sacramento, California 95817
Telephone:      (916) 448-5100
Facsimile:(916) 442-8644

Attorneys for Plaintiffs
RICHARD L. BAYSE, MICHAEL R. CONROY,
MATTHEW J. HEATH, DANIEL KAHAKU,
OSCAR MACHADO, BRANDON W.
RACKLIFFE, RAPHAEL SANCHEZ, DAVID D.
RICHARDS, LARRY SMITH, ANDREI BELEI,
MIGUEL E. VASQUEZ, GEOFFREY T. BROWN,
FRANK A. FELIX, ANDREW W. GRAY, MIKEY
D. JOHNSON, RANDALL W. ROY, JAMES C.
STRINGER, and DANIEL VALENCIA